DISTRICT COURT OF APPEAL OF THE STATE OF FLORIDA
FOURTH DISTRICT

**JACKSON PRIDEMORE,**
Appellant,

v.

**STATE OF FLORIDA,**
Appellee.

No. 4D19-1555

[August 5, 2020]

Appeal from the Circuit Court for the Fifteenth Judicial Circuit, Palm Beach County; John S. Kastrenakes, Judge; L.T. Case No. 17-CF-008009-AMB.

Carey Haughwout, Public Defender, and Breanna Atwood, Assistant Public Defender, West Palm Beach, for appellant.

Ashley Moody, Attorney General, Tallahassee, and Allan R. Geesey, Assistant Attorney General, West Palm Beach, for appellee.

GROSS, J.

Jackson Pridemore appeals his conviction for one count of sexual battery on a person less than 12 years of age. We affirm the conviction and write primarily to address Pridemore's claims that the trial court improperly (1) admitted evidence of a collateral crime into evidence and (2) allowed the state to publish a suicide note authored by the victim in the case.

The charges arose from the state's contention that Pridemore sexually abused his then-girlfriend's daughter ("the victim"), over the course of several years when the girl was between the ages of 7 and 11.

### Williams Rule Evidence/Child Hearsay Evidence

Prior to trial, the state filed notices of intent to offer child hearsay evidence and *Williams*[1] rule evidence at trial. Regarding the child hearsay

---

[1] *Williams v. State*, 110 So. 2d 654 (Fla. 1959).

evidence, the state sought to introduce a handwritten suicide note written by the victim, in which she disclosed that Pridemore sexually abused her. As for the *Williams* rule evidence, the state sought to introduce the testimony of a prior victim, who said that Pridemore molested her when he was in a dating relationship with her mother.[2]

The trial court held a four-day hearing on the state's motions. The following facts emerged at the hearing.

Child Hearsay Evidence

The victim's stepmother (the "stepmother") testified that the victim had been living with her, the victim's father, and the victim's sister for three years, since June 2016. Prior to that, the victim lived with her mother.

In early 2017, when the victim was twelve years old, the stepmother noticed that she was acting out and getting into trouble, which was unusual. Curious about the victim's behavior, the stepmother examined her room and discovered a suicide note in a binder underneath her bed. The suicide note was not addressed to anyone, but it had names and notes underneath it. The stepmother testified that the suicide note seemed "very familiar," explaining that the victim had just watched *13 Reasons Why*, a Netflix series about a girl who killed herself and made tape recordings addressed to different people.

Concerned that the victim was going to kill herself, the stepmother discussed the suicide note with her. The victim told her that it was not a suicide note and that it was more like a diary to allow her to express her feelings. The stepmother returned the note to the victim.

About a month and a half later, the stepmother went through the victim's room a second time and discovered the same suicide note sticking out of the binder, but this time more had been added to the note. These additions said that a crime had been committed against the victim. The note stated in pertinent part:

> This next person might take up the whole page so listen up because I want everyone to know.

---

[2] The state also sought to introduce the prior victim's recorded interview, in which she discussed the sexual abuse committed by Pridemore. After the *Williams* rule hearing, the trial court limited that evidence to the prior victim's testimony alone, so the admissibility of the recorded interview is not at issue in this appeal.

Jackson: . . . it was impossible to live with you.  You know what you did, you told me that if I told anyone I would be taken away from my mom, but guess what I won't be here to get taken away from my mom.  You raped me for about 3 years and I was so scared to tell anyone.  I told 2 people before death but I never said who. . . .  You were the most disgusting man I've ever met. . . .  The 3 years of continuous rape are still in my mind and I have nightmares about it a lot.  You made me think that if I was sexually [indiscernible] in a relationship it made it true, and no I never had sex besides rape but that doesn't count.  You made me very sensitive to the word[;] every time I heard it a trigger was sent through my body[.]  [I]t made me not able to stop thinking [a]bout it.  It made me think that its ok for a 13 year old to grab my ass or kiss me, but it isn't.  You changed my whole life, I bet you everyone who is reading this long page is like damn how was she not so fucked up, but I was and I still am.  I wasn't a good liar or hider, but I bet you my parents never saw this coming.  It ways [sic] me down all the time.  When I hear about any other rape story[,] I think about it.

So that's it.  I bet you that half of y'all didn't think I was a good liar or hider, but you didn't see that coming.  I hope you all move on and have a better life without me.  Except you Jackson.  I hope you go to prison.

The victim was at her mother's house at the time, so the stepmother went there to discuss the note.  The two women showed the victim the letter.  The victim had a complete breakdown; she cried uncontrollably and tried to hide her face.  The stepmother asked the victim "[i]f it was true," and the girl said, "Yes."

A counselor at a child advocacy center interviewed the victim in June 2017.  During the interview, the victim detailed how Pridemore had raped her approximately seven times over a three- to four-year period, beginning when she was seven years old, at a time when Pridemore was dating her mother.

### *Williams* Rule Evidence

The prior victim's mother dated Pridemore before he began his relationship with the victim's mother.  At one point, he lived with the mother and the prior victim.  In March 2013, several years after the mother and Pridemore had broken up, the prior victim, then eleven years old, told

her mother that "[Pridemore] touched me." Her mother asked the prior victim, "what do you mean he touched you?" The prior victim was crying and told her that Pridemore "pulled her pants down touched her [private] and then pulled them back up." When she asked the prior victim "how long," the prior victim said it had "been about a year" before she had reported it to her, explaining that she was afraid to tell her. The prior victim's mother confirmed that she was over the relationship at that point and did not make up the allegation to get back at Pridemore for breaking up with her.

A woman who works for a child protection team testified that she interviewed the prior victim in 2013. A DVD of her recorded interview was admitted into evidence. During this interview, the prior victim disclosed that Pridemore had pulled her underwear down and touched her vagina.

The prior victim told the team member that on the night of the incident, there was a birthday party at her house. Her mom told her to go upstairs and go to bed. The prior victim went upstairs to the bedroom she shared with her mother and laid down to watch TV. About thirty minutes later, Pridemore walked into the room and she could hear him washing his hands. She pretended that she was asleep, but was squinting so she could see what he was doing. Pridemore walked over to the bed and said her name softly a few times to see if she was asleep and waved his hand in front of her. He then walked over to the edge of the bed, pulled the blankets off of her, pulled her underwear down, and then touched her on the outside of her vagina. He did not touch her anywhere else. Pridemore washed his hands again and then left the room. Everyone was downstairs when this happened.

The trial court ruled that the suicide note was admissible. The court observed that: (1) it was something the victim wrote on her own and hid from her stepmother, intending it to be a suicide note in which she described Pridemore's molestation of her; (2) it was spontaneous and specific, not the product of improper influence; and (3) there was no motive to fabricate.

The trial court ruled that the prior victim's testimony was established by clear and convincing evidence and admissible under section 90.404(2)(b). The court noted that the prior victim spontaneously reported the incident to her mother, without any motive to fabricate and with no improper influence. The court referred to the differences between the allegations of the two girls—a one-time touching versus sexual intercourse over a period of several years—but focused on the similarities between the two victims. Both children were prepubescent females, the incidents were

4

sequential in nature, not remote in time, and all occurred in their mothers' respective bedrooms, when Pridemore was alone with the child, taking advantage of his position of trust. Both incidents involved "vaginal touching either by a penis or a finger." The court discussed how Pridemore gained access to the girls by virtue of his dating relationship with each of their mothers. The court limited the collateral evidence at trial to the prior victim's testimony alone, so the prior incident did not become a feature of the trial.

## *Trial and Verdict*

At trial, the State's witnesses were the victim, the victim's stepmother, and the prior victim. A Boynton Beach detective interviewed Pridemore at the police station. He did not admit to sexually assaulting the victim.

Pridemore testified at trial. He said that the victim's mother lived in the same neighborhood where the prior victim's mother resided, until she moved. He denied inappropriately touching the victim or having sex with her.

The jury found Pridemore guilty as charged.

## *The prior victim's testimony was properly admitted pursuant to section 90.404(2)(b), Florida Statutes*

For years, the admissibility of other crimes, wrongs, or acts was evaluated under section 90.404(2)(a), Florida Statutes, which provides:

> Similar fact evidence of other crimes, wrongs, or acts is admissible when relevant to prove a material fact in issue, including, but not limited to, proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident, but it is inadmissible when the evidence is relevant solely to prove bad character or propensity.

This section "restate[d] the Florida law as determined by *Williams v. State*," 110 So. 2d 654 (Fla. 1959). Charles W. Ehrhardt, *Florida Evidence* § 404.9 (2012 ed.). In 2001, the Legislature added section 90.404(2)(b)1., which specifically addressed the admissibility of collateral offenses in a case where the defendant is charged with "child molestation":

> In a criminal case in which the defendant is charged with a crime involving child molestation, evidence of the defendant's commission of other crimes, wrongs, or acts of child

5

molestation is admissible and may be considered for its bearing on any matter to which it is relevant.

Ch. 2001-221, § 1, Laws of Fla.

Under the plain language of the rule, relevant collateral crime evidence is admissible to corroborate a victim's testimony "regardless of whether the charged and collateral offenses occurred in the familial context or whether they share any similarity." *McLean v. State,* 934 So. 2d 1248, 1259 (Fla. 2006).

However, in *McLean*, the Supreme Court narrowed the broad sweep of section 90.402(2)(b)1. by reading the statute in conjunction with section 90.403, Florida Statutes (2005), which requires that the probative value of relevant evidence be weighed against its potential for unfair prejudice. *Id.* at 1251. The Court resolved a due process challenge to section 90.404(2)(b) by applying section 90.403 considerations to ensure that the door is not opened "to [the] introduction of any and all propensity evidence in sexual molestation cases." *Id.*

Central to the analysis required by *McLean* is the notion of similarity between the collateral act and the charged offense. In upholding the constitutionality of the statute, the court noted that "[t]he similarity of the collateral act . . . and charged offense is a critical consideration for the trial court in conducting an appropriate weighing under section 90.403." *Id.* at 1259.

The Court explained that the similarity between the two acts is important in determining admissibility in two ways:

> First, the less similar the prior acts, the less relevant they are to the charged crime, and therefore the less likely they will be admissible. Second, the less similar the prior acts, the more likely that the probative value of this evidence will be "substantially outweighed by the danger of unfair prejudice, confusion of issues, misleading the jury, or needless presentation of cumulative evidence."

*Id.* (quoting § 90.403, Fla. Stat.). The Court concluded that "in both familial and nonfamilial cases" involving child molestation, "the required showing of similarity must be made on a case-by-case basis, and the collateral act evidence is inadmissible if its probative value is substantially outweighed by the danger of unfair prejudice." *Id.* at 1258. The court

enumerated a non-exclusive list of factors a trial court should consider when making a finding of similarity:

> (1) the similarity of the prior acts to the act charged regarding the location of where the acts occurred, the age and gender of the victims, and the manner in which the acts were committed; (2) the closeness in time of the prior acts to the act charged; (3) the frequency of the prior acts; and (4) the presence or lack of intervening circumstances.

*Id.* at 1262.

Acts of child molestation are crimes of access and opportunity. The child victim is "typically the sole eyewitness and corroborative evidence is scant," so that "[c]redibility becomes the focal issue." *Heuring v. State*, 513 So. 2d 122, 124 (Fla. 1987), *superseded by statute on other grounds as stated in McLean*, 934 So. 2d at 1259. Because the victim often knows the perpetrator, "identity is not an issue." *Id.* And, unlike cases involving sexual crimes against adults, the victim's consent cannot be at issue. In a related context, the Legislature broadened the admissibility of child hearsay in "response to the need to establish special protections for child victims in the judicial system." *Conner v. State*, 748 So. 2d 950, 959 (Fla. 1999) (describing legislative intent behind section 90.803(23), Florida Statutes) (citation omitted).

Against this legal backdrop recognizing the unique aspects of child molestation crimes, cases applying the *McLean* framework to child molestation cases have often focused on the similarity between means of access while requiring less commonality between the charged offense and the collateral crime.

For example, in *Stubbs v. State*, 275 So. 3d 631 (Fla. 4th DCA 2019), we emphasized the defendant's means of access as the "significant linking factor" between the charged and collateral crimes. *Id.* at 636. There we held that collateral crime evidence was admissible where the defendant gained access to his victims by exploiting "his role as a trusted religious figure in the girls' lives to gain trust and access and to nullify the girls' objections." *Id.* We listed similarities in how the defendant gained access to the victims:

> All of the girls were members of the defendant's church; [t]he defendant had a relationship of trust with each girl; [t]he defendant expressed that his conduct was justified through religious teaching or sexual education; [t]he defendant held a position of religious authority in each girl's life, and each girl

> believed that the defendant's actions were sanctioned by God; [t]he defendant used his position in the church to gain access to the girls alone and to gain their acquiescence; [and] [t]he defendant was involved in the everyday decision making of each girl . . . .

*Id.* at 635.

Similarly, in *Aguila v. State*, 255 So. 3d 522 (Fla. 3d DCA 2018), the defendant accessed the victim and the collateral victim in similar ways. Both molestations occurred within the "familial context," where the defendant engaged in a relationship with the victims' mothers; both victims were about the same age when the abuse began; the victims' fathers were absent due to their incarceration; the victims did not have good relationships with their mothers; both mothers had drug abuse issues, and the mothers "became financially dependent on the defendant." *Id.* at 529. The *Aguila* court upheld the admission of the collateral crime even though there was a twenty-year gap between that crime and the charged crime. *Id.*; *see also Peralta-Morales v. State*, 143 So. 3d 483, 486 (Fla. 1st DCA 2014) (holding that collateral crime evidence was properly admitted in defendant's trial for molestation of his daughter even though the collateral sexual acts were different from crime charged, where all prior acts were committed against defendant's biological daughters in his house); *Seavey v. State*, 8 So. 3d 1175 (Fla. 2d DCA 2009) (finding collateral crimes admissible where defendant molested young boys by gaining their trust); *Mendez v. State*, 961 So. 2d 1088, 1091 (Fla. 5th DCA 2007) (holding that prior acts were properly admitted in trial for sexual battery on a victim under 12 years old, where defendant had similar relationship with both victims, he gained employment that gave him access to young victims, he was a counselor to each and had custodial authority over them at the time of the offenses, and the incidents both occurred in the victims' homes); *Fincher v. State*, 137 So. 3d 437 (Fla. 4th DCA 2014) (lewd molestation case where defendant inappropriately touched victim and collateral victims by bumping into them in either a Walmart or Kmart).[3]

---

[3] The greatest similarity disconnect in a reported case occurred in *Donton v. State*, 1 So. 3d 1092 (Fla. 1st DCA 2009). There, significant differences in the age, gender, height and weight of the defendant's victims, as well as differences in the nature of the crime, did not preclude the court from finding sufficient similarity between a collateral crime and a charged crime to admit the collateral evidence. In *Donton*, the First District held that the collateral crime evidence of the defendant "licking" and "touching" the vaginal area of a three-year-old was admissible at a trial where the defendant was charged with a sexual battery on a

Where there is no common means of access between the charged crime and collateral crime, some courts have been unwilling to find sufficient similarity to admit the collateral crime under 90.404(2)(b), especially in instances where the prior act was remote in time or where the charged crime is less severe than the collateral crime.

For example, in *Pulcini v. State*, 41 So. 3d 338 (Fla. 4th DCA 2010), the defendant was tried and convicted of unlawful sexual activity with his nephew's sixteen-year-old girlfriend. *Id.* at 340–41. The trial court allowed testimony of prior acts that took place nineteen to twenty years before the alleged crime. *Id.* at 342. This court reversed, noting that "perhaps most significantly, the incidents involving [the prior acts witness] were extremely remote in time to the offenses charged in this case, occurring seventeen years prior." *Id.* at 345–46. However, the court also remarked that the "[r]emoteness factor would be less significant when the sexual abuse is generational or intrafamilial, and if the prior incidents were similar to the current act." *Id.* at 346, n.3. *See Strohm v. State*, 985 So. 2d 640, 642 (Fla. 4th DCA 2008) (seventeen years prior); *Woodard v. State*, 978 So. 2d 217, 220 (Fla. 1st DCA 2008) (seventeen years prior); *Cann v. State*, 958 So. 2d 545, 546 (Fla. 4th DCA 2007) (over ten years prior).

In another category of cases, where the collateral act is more serious than the charged crime, courts are likely to exclude the collateral evidence as unsimilar and unfairly prejudicial under section 90.403. *See, e.g., Taylor v. State*, 256 So. 3d 950, 952 (Fla. 5th DCA 2018) (holding that collateral crime evidence that the defendant had "forcefully inserted his penis in [witness's] vagina" was inadmissible where the defendant was charged with unlawful touching); *Corson v. State*, 9 So. 3d 765 (Fla. 2d DCA 2009) (holding that prior act of possible penile to anal contact was inadmissible where the defendant was charged with touching the victim between her legs).

We conclude that there was no abuse of discretion in the trial court's admission in evidence of the incident involving the prior victim under section 90.404(2)(b). *See Zerbe v. State*, 944 So. 2d 1189, 1193 (Fla. 4th DCA 2006) (a trial judge's ruling on the admissibility of collateral act evidence will not be disturbed absent an abuse of discretion). Pridemore's

male teenager with a mental defect by "penile union with, or penetration of the victim's anus." *Id.* at 1093. The location of the crimes differed. The prior act occurred in the bedroom of a house. *Id.* at 1097. The charged act happened in the shower area of a juvenile facility. *Id.* The court applied a "relaxed standard of admissibility" to the case because it categorized the defendant's relationship to the victims as "familial." *Id.* at 1095. We do not include the case in the body of the opinion because it appears to be an outlier.

acts with the two prepubescent victims were close in time and sequential, demonstrating an escalating level of criminality. The means of access was identical—Pridemore obtained dating relationships with single mothers with young daughters. He exploited his "familial" relationship to find time alone with the girls and assault them in their mothers' respective bedrooms. The collateral act was not too remote in time—Pridemore commenced a relationship with the victim's mother soon after his relationship with the prior victim's mother ended. Nor was the collateral crime more serious than the charged crime, so that its introduction into evidence did not unfairly prejudice the defendant.

### *The trial court properly admitted the victim's suicide note*

Pridemore argues that the trial court erred by admitting the victim's suicide note over his hearsay objection. We hold that the trial court did not abuse its discretion in admitting the note as an exception to the rule against hearsay, pursuant to section 90.803(23), Florida Statutes (2018). *Platt v. State*, 201 So. 3d 775, 777 (Fla. 4th DCA 2016).

Section 90.803(23) sets forth the standard for admitting hearsay statements of a child victim in sexual abuse cases. "For a hearsay statement to be admitted under this section, the statement must meet two specific reliability requirements: (1) the source of the information through which the statement was reported must indicate trustworthiness; and (2) the time, content, and circumstances of the statement must reflect that the statement provides sufficient safeguards of reliability." *State v. Townsend*, 635 So. 2d 949, 954 (Fla. 1994).

In addition to the factors enumerated in section 90.803(23)(a)1., the court may consider other factors such as

> the statement's spontaneity; whether the statement was made at the first available opportunity following the alleged incident; whether the statement was elicited in response to questions from adults; the mental state of the child when the abuse was reported; whether the statement consisted of a child-like description of the act; whether the child used terminology unexpected of a child of similar age; the motive or lack thereof to fabricate the statement; the ability of the child to distinguish between reality and fantasy; the vagueness of the accusations; the possibility of any improper influence on the child by participants involved in a domestic dispute; and contradictions in the accusation.

*Id.* at 957–58.

10

The trial court found that the suicide note was "spontaneous" and "specific," and that there was no improper influence or motive to fabricate, since the note "was something the child wrote on her own and hid from her stepmother, intending it to be a suicide note referencing Mr. Pridemore's molestation of her." The court determined that the circumstances surrounding the note "absolutely indicate[d] its reliability." Although the second version of the note was written after her stepmother's discovery, the victim explained that she wrote down the allegations against Pridemore "because she had to get it out." She said she believed that no one was going to look at the journal in her room, because it looked like a regular notebook. The victim's testimony at trial satisfies the requirement of section 90.803(23)(a)2.a. A factual basis in the record supports the trial court's ruling.

We similarly reject the argument that the note was unfairly prejudicial under section 90.403. The victim's participation at trial gave defense counsel the opportunity to explore the motivation behind the diary. *See Bass v. State*, 35 So. 3d 43, 46 (Fla. 1st DCA 2010) (finding no section 90.403 violation by the introduction of witnesses' out-of-court statements, "especially since the defense counsel was allowed to attack the credibility of several of the witnesses at trial").

### The Remaining Issues are Without Merit

We summarily dispose of the remaining issues. There was no violation of *Faretta v. California*, 422 U.S. 806 (1975). *See Knight v. State*, 770 So. 2d 663 (Fla. 2000); *Monte v. State,* 51 So. 3d 1196 (Fla. 4th DCA 2011); *Neal v. State,* 142 So. 3d 883 (Fla. 1st DCA 2014). There was no reversible error in the trial court's conduct during jury selection, especially in light of defense counsel's difficulty in framing an unobjectionable question. Defense counsel's objection to a detective's comment on Pridemore's right to remain silent was untimely and any error was harmless. The court did not abuse its discretion in refusing to grant a mistrial after the stepmother's display of emotion on the witness stand.

*Affirmed.*

WARNER and GERBER, JJ., concur.

\* \* \*

**Not final until disposition of timely filed motion for rehearing.**

11